UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

     v.                                  CASE NO. 8:17-cr-507-T-02AEP

HASAN PEARSON

**UNITED STATES' RESPONSE IN OPPOSITION TO
PEARSON 'S MOTION FOR COMPASSIONATE RELEASE**

The United States opposes Pearson's motion for release pursuant to 18
U.S.C. § 3582(c)(1)(A)(i) based on COVID-19 concerns. Doc. 527. Though
the Warden of his facility denied his claim, Pearson has not exhausted his
administrative remedies. Further, Pearson has served only slightly more than
ten percent of his twenty-five-year sentence and 18 U.S.C. § 3553(a) factors
strongly disfavor compassionate release. And, in any event, the Bureau of
Prisons ("BOP") has implemented a COVID-19 action plan to minimize the
risk of transmission into and throughout its facilities.[1] Accordingly, COVID-
19 is not an extraordinary and compelling reason to grant Pearson
compassionate release.

---

[1] *See* Updates to BOP Covid-19 Action Plan, available at
https://www.bop.gov/resources/news/20200319_covid19_update.jsp (last
updated March 19, 2020).

I.   **Background.**

On November 20, 2018, Judge Whittemore sentenced Pearson to 300 months' imprisonment after pleading guilty to Conspiracy to Distribute and Possess with Intent to Distribute One Kilogram or More of Heroin, Four Hundred Grams or More of Fentanyl, and One Hundred Grams or More of a Fentanyl Analogue Resulting in Death and Serious Bodily Injury. Doc. 484. Pearson is currently incarcerated at FCI Coleman Medium in Florida, is 38 years old, and is projected to be released on December 18, 2038. *See* Ex. 1; *see also* BOP Inmate Locator at https://www.bop.gov/inmateloc/ (last accessed on June 27, 2020). On June 8, 2020, Pearson filed the instant motion for compassionate release relying on the threat posed by the COVID-19 pandemic. Doc 527.

The United States is cognizant of inmate concerns stemming from COVID-19. The United States, nor the BOP, minimize the concern or risk; this unique situation is being diligently monitored. The BOP has taken aggressive action to mitigate the effects of COVID-19, and has been taking proactive steps to prevent potential coronavirus transmissions for months. As detailed below, the United States opposes Pearson's requested relief.

## II.   The BOP's response to COVID-19.

COVID-19 is a dangerous illness that, in a short time, has caused many deaths in the United States and a massive disruption to our society and economy. In response to the pandemic, the BOP has taken significant measures to protect the health of the inmates in its charge. To aid this Court in its consideration of Pearson's motion, a summary of the BOP's response to COVID-19 follows.

The BOP has explained that "maintaining safety and security of [BOP] institutions is [BOP's] highest priority." BOP, Updates to BOP COVID-19 Action Plan: Inmate Movement (Mar. 19, 2020), available at https://www.bop.gov/resources/news/20200319_covid19_update.jsp.

Indeed, BOP has had a Pandemic Influenza Plan in place since 2012. *See* BOP Health Services Division, Pandemic Influenza Plan-Module 1: Surveillance and Infection Control (Oct. 2012), available at https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf. That protocol is lengthy and detailed. It establishes a six-phase framework requiring BOP facilities to begin preparations when there is first a "[s]uspected human outbreak overseas." *Id*. at i. The plan addresses social distancing, hygienic and cleaning protocols, and the quarantining and treatment of symptomatic inmates.

3

Consistent with that plan, the BOP began planning for potential coronavirus transmissions in January 2020 by establishing a working group to develop policies in consultation with subject matter experts in the Centers for Disease Control, including by reviewing guidance from the World Health Organization.

On March 13, 2020, BOP began to modify its operations, in accordance with its Coronavirus (COVID-19) Action Plan ("Action Plan"), to minimize the risk of COVID-19 transmission into and inside its facilities. Since that time, as events require, BOP has repeatedly revised the Action Plan to address the crisis.

Beginning April 1, 2020, BOP implemented Phase Five of the Action Plan, which currently governs operations. The current modified operations plan requires that all inmates in every BOP institution be secured in their assigned cells/quarters for a period of at least 14 days, in order to stop any spread of the disease. Only limited group gathering is afforded, with attention to social distancing to the extent possible, to facilitate commissary, laundry, showers, telephone, and computer access. Further, BOP has severely limited the movement of inmates and detainees among its facilities. Though there will be exceptions for medical treatment and similar exigencies, this step as well will limit transmissions of the disease. Likewise, all official staff travel has been canceled, as has most staff training.

All staff and inmates have been and will continue to be issued face masks and strongly encouraged to wear an appropriate face covering when in public areas when social distancing cannot be achieved.

Every newly admitted inmate is screened for COVID-19 exposure risk factors and symptoms. Asymptomatic inmates with risk of exposure are placed in quarantine for a minimum of 14 days or until cleared by medical staff. Symptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation. In addition, in areas with sustained community transmission, such as Philadelphia, all facility staff are screened for symptoms. Staff registering a temperature of 100.4 degrees Fahrenheit or higher are barred from the facility on that basis alone. A staff member with a stuffy or runny nose can be placed on leave by a medical officer.

Contractor access to BOP facilities is restricted to only those performing essential services (e.g., medical or mental health care, religious, etc.) or those who perform necessary maintenance on essential systems. All volunteer visits are suspended absent authorization by the Deputy Director of the BOP. Any contractor or volunteer who requires access will be screened for symptoms and risk factors.

Social and legal visits were stopped as of March 13, and remain
suspended until at least May 18, 2020, to limit the number of people entering
the facility and interacting with inmates. In order to ensure that familial
relationships are maintained throughout this disruption, BOP has increased
inmates' telephone allowance to 500 minutes per month. Tours of facilities are
also suspended. Legal visits are permitted on a case-by-case basis after the
attorney has been screened for infection in accordance with the screening
protocols for prison staff.

Further details and updates of BOP's modified operations are available
to the public on the BOP website at a regularly updated resource page:
www.bop.gov/coronavirus/index.jsp.

III.    **As part of its response to COVID-19, the BOP may designate certain
        inmates to a term of home confinement.**

In an effort to relieve the strain on BOP facilities and assist inmates who
are most vulnerable to the disease and pose the least threat to the community,
the BOP is exercising greater authority to designate inmates for home
confinement. On March 26, 2020, the Attorney General directed the Director
of the Bureau of Prisons, upon considering the totality of the circumstances
concerning each inmate, to prioritize the use of statutory authority to place
prisoners in home confinement. That authority includes the ability to place an
inmate in home confinement during the last six months or 10% of a sentence,
whichever is shorter, *see* 18 U.S.C. § 3624(c)(2), and to move to home

confinement those elderly and terminally ill inmates specified in 34 U.S.C. § 60541(g).

Congress has also acted to enhance the BOP's flexibility to respond to the pandemic. Under the CARES Act, enacted on March 27, 2020, the BOP may "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement" if the Attorney General finds that emergency conditions will materially affect the functioning of BOP. Pub. L. No. 116-136, § 12003(b)(2). On April 3, 2020, the Attorney General gave the BOP Director the authority to exercise this discretion, beginning at the facilities that so far have seen the greatest incidence of coronavirus transmission. *See* April 3, 2020 Memorandum to Director of Bureau of Prisons.[2]

Taken together, all of these measures are designed to mitigate sharply the risks of COVID-19 transmission in BOP institutions. The BOP has pledged to continue monitoring the pandemic and to adjust its practices as

---

[2] BOP has described its increased use of home confinement on its website: https://www.bop.gov/resources/news/20200405_COVID19_home_confinement.jsp. 17. Inmates do not need to apply to be considered for home confinement. BOP Case Management staff are urgently reviewing all inmates to determine which ones meet the criteria established by the Attorney General. While all inmates are being reviewed for suitability for home confinement, any inmate who believes he or she is eligible may request to be referred to home confinement and provide a release plan to his or her Case Manager.

necessary to maintain the safety of prison staff and inmates while also fulfilling incarceration orders.

Unfortunately and inevitably, some inmates have become ill, and more likely will in the weeks ahead. But the BOP must consider its concern for the health of its inmates and staff alongside other critical considerations. For example, notwithstanding the current pandemic crisis, the BOP must carry out its charge to incarcerate sentenced criminals to protect the public. It must consider the effect of a mass release on the safety and health of both the inmate population and the citizenry. It must marshal its resources to care for inmates in the most efficient and beneficial manner possible. It must assess release plans, which are essential to ensure that a defendant has a safe place to live and access to health care in these difficult times. And it must consider myriad other factors, including the availability of both transportation for inmates (at a time that interstate transportation services often used by released inmates are providing reduced service), and supervision of inmates once released (at a time that the Probation Office has necessarily cut back on home visits and supervision).

## IV.   The legal framework of Pearson's home-detention request.

Pearson's motion suggests openness to home confinement. Doc. 527, at 14 (describing two places he can go to under home confinement supervision). That request must be denied because this Court has no authority to direct the

BOP to place a defendant in home confinement. Rather, such designation decisions are committed solely to the BOP's discretion. *See United States v. Calderon*, No. 19-11445, 2020 WL 883084, at *1 (11th Cir. Feb. 24, 2020) (district courts lack jurisdiction to grant early release to home confinement pursuant to Second Chance Act, 34 U.S.C. § 60541(g)(1)(A)).

Once a court imposes a sentence, the BOP is solely responsible for determining an inmate's place of incarceration to serve that sentence. *See* 18 U.S.C. § 3621(b); *Moore v. United States Att'y Gen.*, 473 F.2d 1375, 1376 (5th Cir. 1973) (per curiam)[3]; *see also McKune v. Lile*, 536 U.S. 24, 39 (2002) (plurality opinion) ("It is well settled that the decision where to house inmates is at the core of prison administrators' expertise."). A court has no authority to designate a prisoner's place of incarceration. *Tapia v. United States*, 564 U.S. 319, 331 (2011) ("[a] sentencing court can recommend that the BOP place an offender in a particular facility or program … [b]ut decision making authority rests with the BOP."); 18 U.S.C. § 3621(b) ("The Bureau of Prisons shall designate the place of the prisoner's imprisonment[.]"). Because Pearson's request for home confinement alters only the place of incarceration, not the actual term of incarceration, only the BOP may consider [his/her] request.

---

[3] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent the decisions of the former Fifth Circuit rendered prior to the close of business on September 30, 1981.

Moreover, neither the Constitution nor statute allows the Court to order home confinement. A prisoner has no constitutional right to confinement in any particular place, including in home confinement. *See Sandin v. Conner*, 515 U.S. 472, 478 (1995) ("the Due Process Clause did not itself create a liberty interest in prisoners to be free from intrastate prison transfers."); *Meachum v. Fano*, 427 U.S. 215, 224 (1976) ("The conviction has sufficiently extinguished the defendant's liberty interest to empower the State to confine him in *any* of its prisons."). Following the imposition of sentence, courts have limited jurisdiction to correct or modify that sentence absent specific circumstances enumerated by Congress in 18 U.S.C. § 3582. *United States v. Diaz-Clark*, 292 F.3d 1310, 1319 (11th Cir. 2002). Section 3582(c) contemplates only a reduction in sentence. *See* § 3582(c). But Pearson's request to serve the rest of his term in home confinement, as opposed to prison, works no reduction to his sentence. Home confinement merely permits the inmate to serve out his term of imprisonment at home. Pearson's request for such relief therefore falls outside § 3582(c)'s limited grant of authority to this Court to modify a sentence post-conviction. Because section 3582(c) deprives this Court of jurisdiction to grant home confinement and because Defendant offers no other statutory authority to support his request for such relief, this Court has no authority to act on his request for home confinement.[4]

---

[4] If a court grants a sentence reduction, it may "impose a term of …

## V.   The legal framework of Pearson's compassionate release request.

A court may reduce a term of imprisonment upon finding "extraordinary and compelling circumstances," consistent with applicable policy statements of the Sentencing Commission. 18 U.S.C. § 3582(c)(1)(A). Under the statute, as amended by Section 603(b) of the First Step Act, the Court may act "upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier."

Examples of qualifying "extraordinary and compelling reasons" include (1) terminal illness; (2) a serious medical condition that substantially diminishes the ability of the defendant to provide self-care in prison; or (3) the death of the caregiver of the defendant's minor children. *See* USSG §1B1.13 comment. (n.1). Even when an extraordinary and compelling reason exists, however, a court should only grant a motion for release if it determines that

---

supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment." 18 U.S.C. § 3582(c)(1)(A). In imposing a term of supervised release, the court may impose a period of home confinement as a condition of supervised release, provided that the court finds that home confinement is a "substitute for imprisonment." USSG §5F1.2; *see* 18 U.S.C. § 3583(d). Alternatively, a court may consider modifying an existing term of supervised release to add a period of home confinement, consistent with USSG §5F1.2. *See* section 3583(e)(2).

the defendant is not a danger to the public. USSG §1B1.13(2). And the court must consider, in general, whether the 18 U.S.C. § 3553(a) factors weigh in favor of release. *See* 18 U.S.C. § 3582(c)(1)(A); USSG §1B1.13.

Previously, only the BOP could file a motion for compassionate release. The First Step Act amended the provision to allow defendants to file such a motion as well. *See* First Step Act of 2018, 115 P.L. 391, § 603(b)(1). Before a defendant may file a motion, however, the defendant must have either (a) "fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf," or (b) 30 days must have lapsed since the receipt of such a request by the warden of the prison. 18 U.S.C. § 3582(c)(1)(A). The failure to have exhausted administrative remedies within the BOP is fatal to a defendant's motion for compassionate release. *United States v. Raia*, No. 20-1033, 2020 WL 1647922, at *2 (3rd Cir. Apr. 2, 2020) (published) (per curiam) ("Given BOP's shared desire for a safe and healthy prison environment, we conclude that strict compliance with § 3582(c)(1)(A)'s exhaustion requirement takes on added—and critical—importance."); *see also United States v. Estrada Elias*, No. 6: 06-096-DCR, 2019 WL 2193856, at *2 (E.D. Ky. May 21, 2019); *accord United States v. Elgin*, Case No. 2:14-cr-129-JVB-JEM, 2019 U.S. Dist. LEXIS 86571, *2–3 (N.D. Ind. May 23, 2019); *cf. United States v. Leverette*, 721 F. App'x 916, 917 (11th Cir. 2018) (exhaustion of BOP remedies is requisite for judicial review under 28 U.S.C. § 2241); *United*

12

*States v. Roberson*, 746 F. App'x 883, 885 (11th Cir. 2018) (same); *United States v. Alexander*, 609 F.3d 1250, 1260 (11th Cir. 2010) (same).

An inmate may appeal the Warden's compassionate-release denial through BOP's administrative remedies program. 28 C.F.R § 571.63(a). Here, Pearson has failed to exhaust his administrative remedies. The attached BOP records reflect that Pearson filed a request that the Warden timely denied on May 29, 2020, which has not been administratively appealed. *See* Ex. 2 (Administrative Remedies Log); Ex. 3 (Warden's Denial). This Court should not entertain Pearson's motion for compassionate release absent that appeal (or after 30-day lapse from such an appeal). *Elgin*, 2019 U.S. Dist. LEXIS 86571, at *3. Only a denial at the level of either the BOP's director or general counsel constitutes a "final administrative decision" that may not be further appealed within the administrative remedies program, 28 C.F.R. § 571.63(b), (d). Therefore, absent a final administrative decision, an inmate has failed to exhaust his administrative remedies as required by 18 U.S.C. § 3582(c)(1)(A). Pearson's motion can and should be denied on that ground alone.

## VI. Pearson has not identified extraordinary and compelling reasons for compassionate release.

In any event, Pearson's request for a sentence reduction should be denied because he has not demonstrated "extraordinary and compelling reasons" warranting release. As explained above, under the relevant provision of section 3582(c), a court can grant a sentence reduction only if it determines

that "extraordinary and compelling reasons" justify the reduction and that "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A)(i). The Sentencing Commission's policy statement defines "extraordinary and compelling reasons" to include, as relevant here, certain specified categories of medical conditions. USSG §1B1.13, cmt. n.1(A). Potential COVID-19 exposure is not an extraordinary and compelling reason to grant release under any circumstances.

To state a cognizable basis for a sentence reduction based on a medical condition, a defendant first must establish that a condition that falls within one of the categories listed in the policy statement. Those categories include, as particularly relevant here, (i) any terminal illness, and (ii) any "serious physical or medical condition … that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." USSG §1B1.13, cmt. n.1(A). If a defendant's medical condition does not fall within one of the categories specified in the application note (and no other part of the application note applies), the motion must be denied.

The mere existence of the COVID-19 pandemic—which poses a general threat to every non-immune person in the country—does not fall into either of those categories and therefore could not alone provide a basis for a sentence

14

reduction. The categories encompass specific serious medical conditions afflicting an individual inmate, not generalized threats to the entire population. As the Third Circuit has held, "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release." *Raia*, 2020 WL 1647922 at \*2; *see also United States v. Gileno*, No. 3:19-cr-161-(VAB)-1, 2020 WL 1307108, at \*4 (D. Conn. Mar. 19, 2020) (denying compassionate release because BOP's proposed plan adequately addresses the COVID-19 pandemic).[5] To classify Covid-19 as an extraordinary and compelling reason would not only be inconsistent with the text of the statute and the policy statement, but would be detrimental to the BOP's organized and comprehensive anti-Covid-19 regimens, could result in the scattershot treatment of inmates, and would undercut the strict criteria BOP employs to

---

[5] *See also, e.g.*, *United States v. Coles*, 2020 WL 1899562 (E.D. Mich. Apr. 17, 2020) (denied for 28-year-old inmate at institution with outbreak); *United States v. Okpala*, 2020 WL 1864889 (E.D.N.Y. Apr. 14, 2020); *United States v. Weeks*, 2020 WL 1862634 (S.D.N.Y. Apr. 14, 2020); *United States v. Haney*, 2020 WL 1821988 (S.D.N.Y. Apr. 13, 2020) (denied for 61-year-old with no other conditions); *United States v. Pinto-Thomaz*, 2020 WL 1845875 (S.D.N.Y. Apr. 13, 2020) (two insider trading defendants with less than a year to serve have no risk factors); *United States v. Korn*, 2020 WL 1808213, at \*6 (W.D.N.Y. Apr. 9, 2020) ("in this Court's view, the mere *possibility* of contracting a communicable disease such as COVID-19, without any showing that the Bureau of Prisons will not or cannot guard against or treat such a disease, does not constitute an extraordinary or compelling reason for a sentence reduction under the statutory scheme."); *United States v. Carver*, 2020 WL 1892340 (E.D. Wash. Apr. 8, 2020).

determine individual inmates' eligibility for sentence reductions and home confinement. Section 3582(c)(1)(A) contemplates sentence reductions for specific individuals, not the widespread prophylactic release of inmates and the modification of lawfully imposed sentences to deal with a world-wide viral pandemic.

Courts have generally recognized that "it is a rare case in which health conditions present an 'exceptional reason'" to allow for release where detention otherwise would be warranted. *United States v. Wages*, 271 Fed. App'x 726, 728 (10th Cir. 2008) (considering pretrial detention). A defendant seeking compassionate release bears the burden of establishing that release is warranted. *United States v. Heromin*, 8:11-cr-550-T-33SPF, 2019 WL 2411311, at *2 (M.D. Fla. June 7, 2019) (J. Covington); *cf. United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013) (holding that a movant for a reduction under section 3582(c)(2) bears the burden to establish a reduction is warranted). Here, Pearson simply has not met his burden.

Pearson identified that he is asthmatic, a condition corroborated in his Pre-Sentence Report and records obtained from the BOP. Though asthma is a condition associated with being at greater risk for complications from COVID-19, Pearson does not show how his medical needs will not be met while in BOP custody, save for recounting an incident in which he was denied medical attention when displaying COVID-19 symptoms. Doc. 527, at 16. Records

16

from BOP indicate that this incident occurred in February 2020 when Pearson presented with flu-like symptoms. He received treatment and there were no further complications specified. Pearson has not, and cannot, show that the BOP is incapable of providing him adequate medical care and attention.

The United States has contacted FCI Coleman Medium, the facility that houses Pearson. Only two active cases of COVID-19 have been reported at Pearson's facility, and those staff members have been isolated from others. The severity of the COVID-19 pandemic is much lower than other federal prison facilities, such as FCI Elkton and FCC Oakdale. Moreover, the rate of infection at FCI Coleman Medium is markedly lower than the rapid proliferation of COVID-19 currently being experienced in Florida. Contrary to the claims in his motion, Pearson is presently safer in custody than if he were to be released.

Finally, even if a case of COVID-19 were to be confirmed at the facility, the facility has the capacity to address it. The facility employs a team of medical professionals and provides round-the-clock medical care. The facility is equipped to provide medical isolation when required. By virtue of being in the BOP's custody, Pearson is in the presence of medical professionals at all times. In the unlikely event that Pearson becomes infected with Covid-19, he will be quarantined, monitored, and receive necessary medical treatment, wholly consistent with the CDC's guidelines. Pearson has not made a factual

record that his needs will not be met while detained.

**VII.    Even if Pearson could establish an extraordinary and compelling reason for compassionate release, the applicable section 3553(a) factors strongly weigh against granting him compassionate release.**

Furthermore, setting COVID-19 concerns aside, this Court must deny release unless it determines the defendant "is not a danger to the safety of any other person or to the community." USSG §1B1.13(2). Additionally, this Court must consider the section 3553(a) factors, as "applicable," as part of its analysis. *See* section 3582(c)(1)(A); *United States v. Chambliss*, 948 F.3d 691, 694 (5th Cir. 2020). Pearson has not met his burden of establishing eligibility, and the section 3553(a) factors strongly weigh against granting compassionate release.

Pearson would pose a danger to public safety if released. This Court should deny a sentence reduction on that basis alone. His offense of conviction was for a sizable opioid trafficking conspiracy that charged the conspirators with overdoses resulting in four deaths and one serious bodily injury. Pearson was not just a member of the conspiracy; he was the source of supply to codefendant Salik Stevens, a local drug dealer and link between Pearson and the other dealers in this case.

In addition, the § 3553(a) factors strongly disfavor a sentence reduction. The day Hasan Pearson came to Lakeland from New Jersey was a day unlike any other in the summer of 2016. But to those who used the opioids he

18

supplied to the area, the day Hasan Pearson came to town was catastrophic to them, and traumatic to those whose loved ones died while chasing one last high. Five of those incidents – four fatal and one non-fatal – had evidence sufficient to prove beyond a reasonable doubt the complicity of various charged defendants, in varying degrees of culpability. On the day Pearson was arrested, he threw a bag on the ground while fleeing from the police that contained 2,000 doses of a fentanyl analogue/heroin mixture. Doc. 349, at ¶ 82. These doses had the same trademark, "Kill Bill", as those found next to one of the victim's bodies in this case. The overall conduct was so severe, explained in minute detail in the Pre-Sentence Report, *Id*. at ¶¶ 18-82, that Judge Whittemore disagreed with the parties' sentencing recommendation and imposed a five-year upward variance, for a total of 300 months. To date, Pearson has served about 34 months of this sentence, a little over 10% of the total. This is simply insufficient to merit Pearson's release.

In sum, this Court should deny Pearson's motion for compassionate release based on his failure to exhaust administrative remedies. And, if this Court were to consider the merits of Pearson's motion, it fails there, too, because Pearson has not met his burden to show that a reduction is warranted in light of the danger he poses to the community, the need to protect the public, and the need to afford adequate deterrence for his conduct.

Lastly, Pearson's premature release would infringe on his victims' right to reasonable protection provided under the Crime Victims' Rights Act, which specifies that crime victims have "[t]he right to be reasonably protected from the accused." 18 U.S.C. § 3771(a)(1). The CVRA requires that the Court "ensure that the crime victim is afforded the rights" contained therein, which rights include "the right to reasonable, accurate, and timely notice of any public court proceeding" involving the defendant's release. 18 U.S.C. §§ 3771(a)(2), (b)(1).

## CONCLUSION

For the foregoing reasons, this Court should deny Pearson's motion for compassionate release based on COVID-19.

Respectfully submitted,

MARIA CHAPA LOPEZ
United States Attorney

By:    */s/ Daniel M. Baeza*
       DANIEL M. BAEZA
       Assistant United States Attorney
       USAO No. 164
       400 N. Tampa Street, Suite 3200
       Tampa, Florida 33602-4798
       Telephone:   (813) 274-6000
       Facsimile:   (813) 274-6358
       E-mail:      Daniel.Baeza@usdoj.gov

20

25

U.S. v. Hasan Pearson                    Case No. 8:17-cr-507-T-02AEP

## CERTIFICATE OF SERVICE

I hereby certify that on June 30, 2020, I electronically filed the

foregoing with the Clerk of the Court by using the CM/ECF system which

will send a notice of electronic filing to the Defense Counsel of Record.

I hereby certify that on June 30, 2020, a true and correct copy of the

foregoing document and the notice of electronic filing were sent by United

States Mail to the following non-CM/ECF participant(s):

> Hasan Pearson, Reg. No. 69314-018
> FCI Coleman Medium
> Federal Correctional Institution
> P.O. Box 1032
> Coleman, FL 33521

> */s/ Daniel M. Baeza*
> DANIEL M. BAEZA
> Assistant United States Attorney
> USAO No. 164
> 400 N. Tampa Street, Suite 3200
> Tampa, Florida 33602-4798
> Telephone:   (813) 274-6000
> Facsimile:   (813) 274-6358
> E-mail:        Daniel.Baeza@usdoj.gov